**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

SHARON JO STONE,

                Plaintiff,

vs.                                     Case No. 3:16-cv-1588-J-JRK

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

                Defendant.
_____/

## <u>OPINION AND ORDER</u>[1]

### I.  Status

Sharon Jo Stone ("Plaintiff") is appealing the Commissioner of the Social Security Administration's ("SSA('s)") final decision denying her claims for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff's alleged inability to work is a result of bipolar disorder, "fusions on the spine," arthritis, "back issues," and degenerative cervical pain. Transcript of Administrative Proceedings (Doc. No. 12; "Tr." or "administrative transcript"), filed March 13, 2017, at 86, 96, 108, 122, 234 (emphasis omitted). On February 15, 2013, Plaintiff filed an application for DIB, alleging an onset disability date of June 30,

---

[1]     The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. <u>See</u> Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (Doc. No. 13), filed March 13, 2017; Reference Order (Doc. No. 15), entered March 14, 2017.

2012. Tr. at 209.[2] At a later date, Plaintiff filed an application for SSI. See Tr. at 239.[3] Plaintiff's applications were denied initially, see Tr. at 86-95, 106, 140, 141-42 (DIB); Tr. at 96-105, 107, 144, 145-46 (SSI), and upon reconsideration, see Tr. at 108-20, 136, 149, 150-51 (DIB); Tr. at 122-34, 137, 155, 156-57 (SSI).

On July 15, 2015, an Administrative Law Judge ("ALJ") held a hearing, during which he heard from Plaintiff, who was represented by counsel, and a vocational expert ("VE"). Tr. at 44-85. At the time of the hearing, Plaintiff was fifty-one years old. Tr. at 47. The ALJ issued a Decision on August 19, 2015, finding Plaintiff not disabled through the date of the Decision. Tr. at 25-38.

The Appeals Council then received additional evidence in the form of a brief authored by Plaintiff's counsel. Tr. at 5; see Tr. at 299-303 (brief). On October 27, 2016, the Appeals Council denied Plaintiff's request for review, Tr. at 1-3, thereby making the ALJ's Decision the final decision of the Commissioner. On December 28, 2016, Plaintiff commenced this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) by timely filing a Complaint (Doc. No. 1), seeking judicial review of the Commissioner's final decision.

On appeal, Plaintiff makes the following arguments: 1) "[t]he ALJ's mental residual functional capacity [("RFC")] determination is unsupported by substantial evidence as the ALJ improperly subordinated the highly supported examining/treating opinion evidence to

---

[2]    Although actually completed on February 15, 2013, see Tr. at 209, the protective filing date of the application is listed elsewhere in the administrative transcript as February 8, 2013, see Tr. at 87, 106.

[3]    The date of the SSI application is not apparent from the record, but the protective filing date is listed as February 8, 2013. See Tr. at 96, 107.

that of the non-examining State agency psychological consultants"; and 2) "[t]he ALJ should not have relied on Plaintiff's failure to seek medical treatment as a basis for discounting her credibility." Plaintiff's Memorandum of Law in Support of a Social Security Appeal (Doc. No. 17; "Pl.'s Mem."), filed May 12, 2017, at 1, 13, 18 (emphasis omitted). On July 10, 2017, Defendant filed a Memorandum in Support of the Commissioner's Decision (Doc. No. 18; "Def.'s Mem.") addressing Plaintiff's arguments. After a thorough review of the entire record and consideration of the parties' respective filings, the undersigned finds the Commissioner's final decision is due to be reversed and remanded for further administrative proceedings.

## II.  The ALJ's Decision

When determining whether an individual is disabled,[4] an ALJ must follow the five-step sequential inquiry set forth in the Code of Federal Regulations ("Regulations"), determining as appropriate whether the claimant (1) is currently employed or engaging in substantial gainful activity; (2) has a severe impairment; (3) has an impairment or combination of impairments that meets or medically equals one listed in the Regulations; (4) can perform past relevant work; and (5) retains the ability to perform any work in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Phillips v. Barnhart, 357 F.3d 1232, 1237 (11th Cir. 2004). The claimant bears the burden of persuasion through step four and, at step five, the burden shifts to the Commissioner. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987).

---

[4]        "Disability" is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Here, the ALJ followed the five-step sequential inquiry. See Tr. at 27-37. At step one, the ALJ determined that Plaintiff "has not engaged in substantial gainful activity since June 30, 2012, the alleged onset date." Tr. at 27 (emphasis and citation omitted). At step two, the ALJ found that Plaintiff "has the following severe impairments: a history of degenerative disc disease of the cervical spine status post two fusions, possible C7 radiculopathy, bipolar disorder and a schizoaffective disorder." Tr. at 27 (emphasis and citations omitted). At step three, the ALJ ascertained that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 [C.F.R.] Part 404, Subpart P, Appendix 1." Tr. at 28 (emphasis and citations omitted).

The ALJ determined that Plaintiff has the following RFC:

[Plaintiff can] perform a range of light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.967(b) with limitations. Specifically, [Plaintiff] can sit, stand or walk for up to six hours each during an eight-hour workday. She can lift/carry [twenty] pounds occasionally and [ten] pounds or less more frequently. She can push or pull arm, hand or foot pedal controls occasionally. She also can climb ramps or stairs occasionally, but she must never climb ladders, ropes or scaffolds. In addition, [Plaintiff] can occasionally balance, kneel, stoop, crouch or crawl. She also should avoid use of her neck for extreme twisting maneuvers but she can reach in all directions, except overhead, frequently. There are no restrictions in her ability to handle, finger and feel within the above weight limits. However, [Plaintiff] must avoid overhead reaching and she must avoid working at unprotected heights, work around dangerous moving machinery and work in proximity to heavy industrial vibrations. [Plaintiff] also must . . . avoid extremely cold temperatures and she is further limited to performing simple, rote and repetitive tasks in a work environment that does not change from one day to the next. Furthermore, [Plaintiff] must avoid interaction with the general public and she is limited to no more than occasional interaction with coworkers or supervisors. [Plaintiff] also must avoid work that requires that she meet a strict production goal or quota such as assembly line work or pay-by-piece type work. [Plaintiff] will work better with things as opposed to people.

Tr. at 30 (emphasis omitted). At step four, the ALJ relied on the testimony of the VE and found Plaintiff "is capable of performing her past relevant work as a wire preparation worker." Tr. at 36 (emphasis omitted).

The ALJ then proceeded to make alternative findings regarding the fifth and final step of the sequential inquiry. Tr. at 36-37. At step five, after considering Plaintiff's age ("48 years old . . . on the alleged disability onset date"), education ("a limited education"), work experience, and RFC, the ALJ again relied on the testimony of the VE and found "there are other unskilled jobs that exist in significant numbers in the national economy that [Plaintiff] also can perform," Tr. at 36, including "Marker," "Routing Clerk," and "Collator Operator," Tr. at 37. The ALJ concluded that Plaintiff "has not been under a disability . . . from June 30, 2012 through the date of th[e D]ecision." Tr. at 37 (emphasis and citation omitted).

### III. Standard of Review

This Court reviews the Commissioner's final decision as to disability pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Although no deference is given to the ALJ's conclusions of law, findings of fact "are conclusive if . . . supported by 'substantial evidence' . . . ." Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing Falge v. Apfel, 150 F.3d 1320, 1322 (11th Cir. 1998)). "Substantial evidence is something 'more than a mere scintilla, but less than a preponderance.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quoting Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987)). The substantial evidence standard is met when there is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Falge, 150 F.3d at 1322 (quoting Richardson v. Perales,

402 U.S. 389, 401 (1971)). It is not for this Court to reweigh the evidence; rather, the entire record is reviewed to determine whether "the decision reached is reasonable and supported by substantial evidence." Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991) (internal quotation and citations omitted); see also McRoberts v. Bowen, 841 F.2d 1077, 1080 (11th Cir. 1988); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987). The decision reached by the Commissioner must be affirmed if it is supported by substantial evidence—even if the evidence preponderates against the Commissioner's findings. Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158-59 (11th Cir. 2004) (per curiam).

## IV.  Discussion

As noted above, Plaintiff makes two arguments. First, she argues the ALJ erred when he "subordinated" the "treating/examining opinion evidence" to that of the non-examining consultants. Pl.'s Mem. at 1, 13 (emphasis omitted). Specifically, she contends that "[t]he ALJ committed reversible error in rejecting the supported opinions of Dr. [Raena] Baptiste-Boles and Dr. [J.] Gaines." Id. Second, Plaintiff asserts that the ALJ, in making his credibility finding, erred in relying on Plaintiff's failure to seek treatment because, according to Plaintiff, this failure was "due to lack of funds." Id. at 18-19. Further, argues Plaintiff, "the ALJ never took into account [that] Plaintiff's mental illness may have led her to avoid treatment." Id. at 19. These arguments, and the law applicable to each, are addressed in turn.

**A. ALJ's Evaluation of Medical Opinions**

**1. Applicable Law**[5]

The Regulations establish a "hierarchy" among medical opinions[6] that provides a framework for determining the weight afforded each medical opinion: "[g]enerally, the opinions of examining physicians are given more weight than those of non-examining physicians[;] treating physicians[' opinions] are given more weight than [non-treating physicians;] and the opinions of specialists are given more weight on issues within the area of expertise than those of non-specialists." McNamee v. Soc. Sec. Admin., 164 F. App'x 919, 923 (11th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(1), (2), (5)). The following factors are relevant in determining the weight to be given to a physician's opinion: (1) the "[l]ength of the treatment relationship and the frequency of examination"; (2) the "[n]ature and extent of [any] treatment relationship"; (3) "[s]upportability"; (4) "[c]onsistency" with other medical evidence in the record; and (5) "[s]pecialization." 20 C.F.R. §§ 404.1527(d)(2)-(5), 416.927(d)(2)-(5); see also 20 C.F.R. §§ 404.1527(e), 416.927(f).

---

[5] On January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence for claims filed on or after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844 (January 18, 2017). Because Plaintiff filed her claims before that date, the undersigned cites the rules and Regulations that were in effect on the date of the ALJ's Decision, unless otherwise noted.

[6] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2); see also 20 C.F.R. § 404.1513(a) (defining "[a]cceptable medical sources").

With regard to a treating physician,[7] the Regulations instruct ALJs how to properly weigh such a medical opinion. See 20 C.F.R. § 404.1527(c). Because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)," a treating physician's medical opinion is to be afforded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. Id. When a treating physician's medical opinion is not due controlling weight, the ALJ must determine the appropriate weight it should be given by considering the factors identified above (the length of treatment, the frequency of examination, the nature and extent of the treatment relationship, as well as the supportability of the opinion, its consistency with the other evidence, and the specialization of the physician). Id.

If an ALJ concludes the medical opinion of a treating physician should be given less than substantial or considerable weight, he or she must clearly articulate reasons showing "good cause" for discounting it. Hargress v. Soc. Sec. Admin., Comm'r, __ F.3d __, No. 17-11683, 2018 WL 1061567 (11th Cir. Feb. 27, 2018); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). Good cause exists when (1) the opinion is not bolstered by the evidence; (2) the evidence supports a contrary finding; or (3) the opinion is conclusory or inconsistent with the treating physician's own medical records. Hargress, 2018 WL 1061567;

_____

[7]    A treating physician is a physician who provides medical treatment or evaluation to the claimant and who has, or has had, an ongoing treatment relationship with the claimant, as established by medical evidence showing that the claimant sees or has seen the physician with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for the medical condition. See 20 C.F.R. § 404.1502.

Phillips, 357 F.3d at 1240-41; see also Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991); Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987) (stating that a treating physician's medical opinion may be discounted when it is not accompanied by objective medical evidence).

An examining physician's opinion, on the other hand, is not entitled to deference. See McSwain v. Bowen, 814 F.2d 617, 619 (11th Cir. 1987) (per curiam) (citing Gibson v. Heckler, 779 F.2d 619, 623 (11th Cir. 1986)); see also Crawford, 363 F.3d at 1160 (citation omitted). Moreover, the opinions of non-examining physicians, taken alone, do not constitute substantial evidence. Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985) (citing Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)). However, an ALJ may rely on a non-examining physician's opinion that is consistent with the evidence, while at the same time rejecting the opinion of "any physician" whose opinion is inconsistent with the evidence. Oldham v. Schweiker, 660 F.2d 1078, 1084 (5th Cir. Unit B. 1981) (citation omitted).

An ALJ is required to consider every medical opinion. See 20 C.F.R. §§ 404.1527(d), 416.927(d) (stating that "[r]egardless of its source, we will evaluate every medical opinion we receive"). While "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion," Oldham, 660 F.2d at 1084 (citation omitted); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor," Winschel v. Comm'r of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011) (citing Sharfarz v. Bowen, 825 F.2d 278, 279

(11th Cir.1987)); see also Hargress, 2018 WL 1061567; Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005); Lewis, 125 F.3d at 1440.

### 2. Opinions at Issue

#### a. Dr. Baptiste-Boles

Dr. Baptiste-Boles is a licensed psychologist who, at the request of the SSA, conducted a psychological examination of Plaintiff on October 23, 2013. See Tr. at 384-86. According to Dr. Baptiste-Boles's examination notes, Plaintiff reported that her current mental health conditions included "emotional lability, 'feeling like someone is watching [her],' 'feeling paranoid,' racing thoughts, isolation, difficulty trusting people 'even [her] kids,' and sadness/tearfulness." Tr. at 384. She also reported "feeling as if the TV knows what [she is] doing." Tr. at 384. She stated her symptoms "often occur daily" but that she tries to "control it." Tr. at 385. She reported she was feeling nervous at the time of the examination, and Dr. Baptist-Boles noted that her "affect appeared anxious." Tr. at 385. Dr. Baptiste-Boles opined that Plaintiff's "current level of mental health symptoms would best be characterized as moderate to severe." Tr. at 385.

Dr. Baptiste-Boles also indicated Plaintiff was "alert and oriented"; she did not have "any significant problems with motor functioning"; the "rate of observed speech was unremarkable"; she "demonstrated adequate attention and concentration"; and she had "adequate" mental flexibility, receptive language, immediate memory, mental computation, and social skills. Tr. at 385-86. According to Dr. Baptiste-Boles, Plaintiff's "[i]nsight appeared to be limited," but her "[g]eneral thought processes appeared to be coherent, logical, and

goal directed." Tr. at 386. Dr. Baptiste-Boles concluded that Plaintiff's "overall presentation appeared valid and consistent with the reported conditions," and that her "mental health symptoms[,] based on report[s] and clinical observations[,] appear to be moderately impacting activities of daily living, vocational performance, and interpersonal interactions." Tr. at 386. She assigned Plaintiff a Global Assessment of Functioning ("GAF") of 51.[8] Tr. at 386.

The ALJ gave "limited weight to the overall psychiatric assessment of Dr. Baptiste-Boles." Tr. at 33. In doing so, he noted that Dr. Baptiste-Boles is not Plaintiff's treating physician. Tr. at 33. The ALJ stated that Dr. Baptiste-Boles's "clinical observations regarding [Plaintiff's] mental status and functioning are inconsistent with the GAF score assignment of 51 offered by the clinician—a finding that suggests moderate psychiatric symptoms." Tr. at 33. According to the ALJ, Plaintiff reported symptoms to Dr. Baptiste-Boles's "that she did not previously report to her other medical providers." Tr. at 33. The ALJ indicated that "it appears that Dr. Baptiste-Boles substantially relied on [Plaintiff's] self-reporting of such symptoms in concluding that [Plaintiff's] mental impairments significantly restrict her mental functioning." Tr. at 33.

_____

[8]     A GAF score of 51-60 reflects: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., 2000) (emphasis omitted). The most recent edition of the Diagnostic and Statistical Manual, however, has abandoned the use of GAF scores due to their "conceptual lack of clarity and questionable psychometrics in routine practice." Am. Psychiatric Ass'n, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013).

### b. Dr. Gaines and Ms. Stowell

Dr. Gaines is a psychiatrist who apparently works in the same practice as Ms. Stowell, an advanced registered nurse practitioner ("ARNP"). See Tr. at 390, 408. At the hearing, Plaintiff testified that Dr. Gaines works with Ms. Stowell and has been treating her for "two years or maybe a year." Tr. at 62-63. Plaintiff indicated that Dr. Gaines last treated her in the month prior to the hearing, which would have been June 2015. Tr. at 63. The administrative transcript does not contain any treatment notes authored by Dr. Gaines, but it does contain medical records indicating that Ms. Stowell treated Plaintiff on at least eight occasions between July 2014 and June 2015. Tr. at 408.

On January 5, 2015, Ms. Stowell reported that Plaintiff "ha[s] been having some hallucinations." Tr. at 421.[9] Ms. Stowell also indicated Plaintiff appeared anxious, and Plaintiff reported getting "poor sleep [due to] some racing thoughts and auditory hallucinations." Tr. at 421. She stated Plaintiff "has previously been on injections for Invega Sust[enna] but has lost insurance and can no longer be on the injections." Tr. at 421. Ms. Stowell wrote the following note regarding future injections: "[Plaintiff] will be helped with the [patient] assistance program through Tina at counsel on aging and will be be able to provide IM injection next month." Tr. at 421. Although the progress note does not explain the nature

---

[9] Earlier progress notes indicating Plaintiff was seen by Ms. Stowell (July 12, 2014; August 9, 2014; September 6, 2014; October 4, 2015; and October 7, 2014) do not contain any information. See Tr. at 422-27. The undersigned notes that some of these progress notes show that Plaintiff arrived late to the appointments, so the progress notes may be empty because Plaintiff was not treated on those days. Tr. at 422-24.

of the program, it is likely that it is a program for individuals who are unable to afford treatment.

On April 28, 2015, Plaintiff reported to Ms. Stowell that she "r[a]n out of medications." Tr. at 419. Plaintiff's mood was again noted to be anxious, but this time accompanied with mood swings. Tr. at 419. Plaintiff reported that she was "still hearing voices[,] which makes her mind race[ ]." Tr. at 419. On June 12, 2015, Plaintiff indicated she was "doing well on the Invega Sute[nna i]njection" and was not having any hallucinations. Tr. at 417. She reported that she felt "stable." Tr. at 417. Ms. Stowell indicated Plaintiff's thoughts were "still mildly paranoid," and that although Plaintiff was "hearing things" they were "not clear messages," and she was not having any delusions. Tr. at 417.

In March 2014, Ms. Stowell and Dr. Gaines jointly completed a Mental Capacity Assessment of Plaintiff. Tr. at 388-90.[10] They opined Plaintiff has extreme limitations in understanding and memory; marked to extreme limitations in sustained concentration and persistence; marked to extreme limitations in social interaction; and extreme limitations in adaptation. Tr. at 388-90. They stated that Plaintiff is likely to have four or more absences in an average month. Tr. at 389. They listed the following "medical/clinical findings [to] support this assessment": stress-related panic attacks and "schizoaffective disorder with mood swings on antiphychotic injections." Tr. at 390.

The ALJ gave "little weight to the March 2014 Mental Capacity Assessment of [Dr. Gaines]." Tr. at 34. In doing so, the ALJ noted Plaintiff's independence in performing activities of daily living, her "good relationship[s]" with family, and interactions with family and

---

[10]     The undersigned makes this finding based on the fact that the signatures of both Ms. Stowell and Dr. Gaines appeared at the end of assessment form. See Tr. at 390.

friends. Tr. at 34. The ALJ also indicated that "Dr. Gaines failed to offer any detailed treatment notes or other objective medical basis to support his opinions." Tr. at 34.

### 3. Parties' Arguments/Analysis of ALJ's Findings

In general, Plaintiff argues that the ALJ erred in assessing the opinions of Dr. Baptiste-Boles, Dr. Gaines, and Ms. Stowell. As to the ALJ's finding that Dr. Baptiste-Boles's clinical observations are inconsistent with the GAF score she assigned, Plaintiff argues that the "ALJ's reasoning . . . is confusing and unpersuasive" because Dr. Baptiste-Boles opined that Plaintiff's symptoms "moderately impacted her activities of daily living, vocational, performance, and interpersonal interactions." Pl.'s Mem. at 14 (emphasis in original). Plaintiff contends that it is "unclear how moderate psychiatric symptoms are inconsistent with a moderate impact on functioning." Id. Plaintiff also takes issue with the ALJ's statement that Plaintiff reported symptoms to Dr. Baptiste-Boles that she had not reported in the past. Id. at 14-15. According to Plaintiff, she reported these symptoms to other physicians on "various occasions." Id. at 15. Lastly, Plaintiff contends that contrary to the ALJ's assertion that Dr. Baptiste-Boles relied mostly on Plaintiff's subjective complaints, Dr. Baptiste-Boles specifically indicated that she also relied on clinical observations. Id. at 15.

Plaintiff argues these errors are not harmless because "the mental demands of unskilled work include making judgments that are commensurate with the functions of skilled work" and "responding appropriately to supervision, coworkers, and work situations." Id. at 15-16. According to Plaintiff, although the RFC allows for no interaction with the public and

occasional interaction with supervisors and co-workers, "this does not mean Plaintiff will respond appropriately to criticism in the workplace." Id. at 16.

Defendant argues the ALJ did not err in giving "little weight to [Dr. Baptiste-Bales's] statement that Plaintiff's symptoms had a moderate impact on activities of daily living, vocational performance, and interpersonal interactions." Def.'s Mem. at 7-8. According to Defendant, this statement "is generally consistent with the ALJ's finding that Plaintiff's impairments caused moderate difficulties in social functioning and maintaining concentration, persistence, or pace for which he accounted in the RFC." Id. at 8. Defendant argues that "Plaintiff has not shown that the RFC fails to accommodate the moderate impact that Dr. Baptiste-Boles indicated." Id.

As to the ALJ's evaluation of the Mental Capacity Assessment, Plaintiff contends that the ALJ "did not seem to realize [Ms.] Stowell also signed the opinion." Pl.'s Mem. at 16. According to Plaintiff, since "Dr. Gaines is associated with [Ms.] Stowell, [Ms. Stowell's] treatment notes should have been considered in conjunction with Dr. Gaines's opinion." Id. at 17. Thus, argues Plaintiff, the ALJ erred in failing to mention Ms. Stowell's treatment notes. Id. Responding, Defendant argues that although the ALJ did not "associate" Ms. Stowell's progress notes with the Mental Capacity Assessment, "the ALJ properly declined to consider the [Mental Capacity Assessment] as a treating medical source opinion and gave it little weight as inconsistent with Plaintiff's own reports of her regular activities and unsupported by any recorded treatment or examination." Def.'s Mem. at 5-6. Defendant

asserts that "although Dr. Gaines'[s] affiliate Ms. Stowell saw and treated Plaintiff, there is no record showing that [Ms. Stowell] did so at any time before offering her opinion." Id. at 7.

As to the ALJ's evaluation of Dr. Baptiste-Boles's opinion, the undersigned notes that the ALJ ignored the portion of the opinion discussing Plaintiff's reported symptoms, and the ALJ made an inaccurate statement.[11] On balance, however, these are not reversible errors. Dr. Baptiste-Boles ultimately concluded that based on Plaintiff's reports and clinical observations, Plaintiff's condition "appear[s] to be moderately impacting activities of daily living, vocational performance, and interpersonal interactions." Tr. at 386. Given this finding of moderate impairment, it does not appear that Dr. Baptiste-Boles's opinion, alone, is inconsistent with the ALJ's RFC. Even though the ALJ stated he assigned the opinion "limited weight," in reality, he largely adopted it. Thus, the ALJ did not commit reversible error in his assessment of Dr. Baptiste-Boles's opinion.

In discounting the opinions in the Mental Capacity Assessment, the ALJ erred in relying on Plaintiff's independence in performing activities of daily living and her relationships and interactions with family and friends. Plaintiff's ability to perform certain activities of daily living and maintain a relationship with family and friends do not appear to contradict or be

---

[11]    First, although the ALJ set out in detail what the ALJ described as the "unremarkable" findings of the examination, Tr. at 32-33, he failed to mention any of Plaintiff's reported symptoms that Dr. Baptiste-Boles characterized as "moderate to severe," Tr. at 385. Second, the ALJ's statement that the ALJ ignored Plaintiff's reported symptoms because she had not reported these symptoms in the past is inaccurate. Contrary to the ALJ's statement, Plaintiff had indeed made similar reports on prior occasions. See Tr. at 309 (June 2009 hospital consultation report indicating Plaintiff was "very suspicious and guarded" and that Plaintiff reported she "began to feel that people were talking about her[ and] monitoring her progress through her phone and the satellite"); Tr. at 396 (May 2012 psychiatric evaluation note indicating Plaintiff reported "feeling people were after her," "talking about her," and "making gestures," and eventually feeling "she was part of a reality game show"); Tr. at 380 (July 2013 hospital report indicating Plaintiff "is having paranoid thoughts of people trying to harm her and knows it is[ not] really happening but can[not] control the thought").

-16-

inconsistent with the opinions in the Mental Capacity Assessment. Notably, the Mental Capacity Assessment does not contain any opinions regarding Plaintiff's activities of daily living, and to the extent it contains opined limitations in social functioning, these limitations are with regard to social interaction with the "general public," "coworkers or peers," and "supervisors," as opposed to family and friends. Tr. at 389. Further, Plaintiff testified that she has a "harder time [being around] people [she] does[ not] know" as opposed to people she does know. Tr. at 74.

To the extent the ALJ relied on "Dr. Gaines['s] fail[ure] to offer any detailed treatment notes or other objective medical basis to support the opinions," Tr. at 34, the ALJ did not recognize that Ms. Stowell also signed the Mental Capacity Assessment. As noted, the administrative transcript contains progress notes from Ms. Stowell and, as indicated by Defendant, they all postdate the Mental Capacity Assessment. On remand, the ALJ should nonetheless consider these progress notes in reevaluating the opinions, given that he relied on the lack of treatment notes from Dr. Gaines in discrediting the Mental Capacity Assessment and given that Ms. Stowell's progress notes may provide evidence that is consistent with the opinions in the Mental Capacity Assessment.

In sum, the ALJ did not commit reversible error in assessing Dr. Baptiste-Boles's opinion, but the ALJ's assessment of Dr. Gaines's and Ms. Stowell's opinion is not supported by substantial evidence. Accordingly, the undersigned finds that the matter is to be remanded for reconsideration of these opinions.

**B. Plaintiff's Noncompliance**

**1. Applicable Law**[12]

The Regulations provide that noncompliance with prescribed treatment without a "good reason" will preclude a finding of disability. 20 C.F.R. §§ 404.1530(b), 416.930(b). Good reason exists when:

> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
> (4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

Id. "A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling." Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) (quoting Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir.1987)) (internal quotation marks omitted).

If the ALJ substantially relies on a claimant's noncompliance in finding the claimant to be not credible, the ALJ must take into account the claimant's lack of insurance coverage

---

[12] As previously noted, on January 18, 2017, the SSA revised the rules regarding the evaluation of medical evidence for claims filed on or after March 27, 2017. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 5844 (January 18, 2017). Because Plaintiff filed her claims before that date, the undersigned cites the rules and Regulations that were in effect on the date of the ALJ's Decision, unless otherwise noted.

and whether the lack of coverage excuses any noncompliance.  See Dawkins, 848 F.2d at 1213-14 (stating that when an ALJ's finding that a claimant is not disabled is "inextricably tied to [a] finding of noncompliance," an ALJ is required to determine whether the claimant's "poverty excuses noncompliance"); Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (indicating that "if [a] claimant's failure to follow medical treatment is not one of the principal factors in [an] ALJ's decision, then the ALJ's failure to consider the claimant's ability to pay will not constitute reversible error"); see also Lovelace v. Bowen, 813 F.2d 55, 59 (5th Cir. 1987) ("To a poor person, a medicine that he cannot afford to buy does not exist"); Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986) (failure to follow prescribed treatment does not preclude reaching the conclusion that a claimant is disabled when the failure is justified by lack of funds); Dover v. Bowen, 784 F.2d 335, 337 (8th Cir. 1986) (recognizing that "the ALJ must consider a claimant's allegation that he has not sought medical treatment or used medications because of a lack of finances").

## 2.  Parties' Arguments/Analysis of ALJ's Findings

Plaintiff argues that "[t]he ALJ should not have used Plaintiff's inability to seek medical treatment as a basis for implying that she did not experience pain or difficulty with mental functioning." Pl.'s Mem. at 19. Plaintiff also contends that "the ALJ never took into account [that] Plaintiff's mental illness may have led her to avoid treatment." Id. Responding, Defendant asserts that "[t]he ALJ noted Plaintiff's reported lack of insurance and limited finances but also considered that family and friends ocassionally paid for Plaintiff's medical expenses and that Plaintiff only once sought alternative low or no cost medical treatment and

medication services and did not explain why she did not continue to use them." Def.'s Mem. at 13.

The administrative transcript shows that Plaintiff has at times been noncompliant with treatment. It appears that the main reason for this noncompliance has been lack of funds, although at the hearing Plaintiff seemed to indicate that in 2013 she stopped taking her medication because she was feeling better. At the hearing, Plaintiff testified that when she was admitted to Flagler Hospital in July 2013, she was not taking any medications for her mental impairments. Tr. at 61. Plaintiff indicated she "would get out of the hospital . . . [and] would leave with the medication"; she would be compliant "for a few months" but then stop taking it. Tr. at 61. She stated that she "would feel better and think [she] was better." Tr. at 61. According to the July 2013 progress note from Flager Hospital, however, "[s]he ha[d] been on the medication for many years in the past and ha[d] run out about [one] year ago due to loss of insurance." Tr. at 380. Plaintiff testified that she does not have a formal source of income, but that her family and friends give her money to pay for her medical treatment. Tr. at 65-66, 72-73. According to Plaintiff, when she does not receive money, she is unable to comply with prescribed treatment. Tr. at 65.

With regard to Plaintiff's efforts to seek low-cost medical care, Plaintiff testified as follows:

| [ALJ] | . . . Have you ever applied for free care through [Flagler Hospital]? |
|---|---|
| [Plaintiff] | I applied for Medicaid or Medicare, whichever it was. I've applied for that, and I was turned down. |
| [ALJ] | Why? Do you have children under - - |
| [Plaintiff] | No, sir. |

| [ALJ] | You won't get Medicaid. |
|---|---|
| [Plaintiff] | Well, I found that out. |
| [ALJ] | Yeah. Well, they won't give you any Medicaid. You don't have any children. |

Tr. at 67. As previously noted, a January 2015 progress note from Ms. Stowell indicates that Plaintiff sought help from the patient assistance program in order to receive more injections. Tr. at 421.

The ALJ found that Plaintiff has a "history of treatment noncompliance" and that "when [Plaintiff] takes her psychotropic medications as prescribed, her mental state and symptoms are quite stable." Tr. at 31-32. The ALJ acknowledged Plaintiff's reports of "lack of insurance and limited finances." He stated, however, that they "carry little weight" because she "sought alternative low-cost or no cost medical treatment and medication services on only one occasion," and she "failed to offer any evidence or explain why she was unable or otherwise incapable of continuing such low cost or no cost services." Tr. at 32. The ALJ then indicated that "even when [Plaintiff] received money from family and friends to pay for her appointments and medications, [Plaintiff] consistently failed to take her medications as prescribed . . . ." Tr. at 32. The ALJ ultimately concluded that Plaintiff's "ongoing treatment noncompliance suggests that her symptoms are not as limiting as alleged." Tr. at 35.

It is unclear whether the ALJ actually considered Plaintiff's lack of funds and insurance as required under Eleventh Circuit precedent. Although the ALJ recognized that Plaintiff's noncompliance with medication has at times been due to lack of funds, he later relied on this noncompliance to conclude that "her symptoms are not as limiting as alleged." Tr. at 35. To the extent the ALJ found that Plaintiff "consistently" failed to comply with treatment even

when she had the money, he offered no citation to the administrative transcript to support this assertion. See Tr. at 32. Plaintiff's testimony regarding her noncompliance in 2013 leaves it unclear whether Plaintiff stopped taking her medication solely because she felt better or whether she was also unable to afford them, as the medical records from Flagler Hospital indicate. In any event, Plaintiff's testimony on this point does not indicate that she consistently failed to comply with treatment, as indicated by the ALJ. Tr. at 32.

The ALJ's statement that Plaintiff sought low-cost treatment "only on one occasion," Tr. at 32, is inaccurate. The ALJ appears to rely on the question he asked Plaintiff at the hearing regarding whether she had sought low-cost treatment specifically at Flagler Hospital. There were no questions regarding whether Plaintiff sought low-cost medical treatment elsewhere. See Tr. at 67-85. Further, as noted above, the administrative transcript indicates that Plaintiff sought low-cost care at least one other time in January 2015. These inaccuracies constitute reversible error given that the ALJ relied significantly on Plaintiff's noncompliance in discrediting her testimony. See Tr. at 35.

Lastly, although the Eleventh Circuit has not held that an ALJ is required to consider the effect of a claimant's mental illness on his or her noncompliance, several district courts within the Eleventh Circuit, as well as other circuit courts, have highlighted the importance of doing so. See Kidd v. Comm'r of Soc. Sec., No. 6:15-cv-535-Orl-DAB, 2016 WL 3090401, at *5 (M.D. Fla. June 2, 2016) (finding that "a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the 'result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse'") (quoting Pate-Fires v. Astrue, 564 F.3d 935, 945 (8th Cir. 2009) (some alterations in original); Conway v. Colvin, No.

3:14-CV-1004-J-JRK, 2015 WL 5772056, at *4 (M.D. Fla. Sept. 30, 2015) (noting that "a number of courts have recognized the importance of considering whether a claimant's bipolar disorder or other mental illness contributes to the claimant's noncompliance with medication"); see also Jelinek v. Astrue, 662 F.3d 805, 814 (7th Cir. 2011) (stating that the United States Court of Appeals for the Seventh Circuit has "often observed that bipolar disorder . . . is by nature episodic and admits to regular fluctuations even under proper treatment" and has therefore held that "ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference"); Pate-Fires, 564 F.3d at 945 (stating that "[c]ourts considering whether a good reason supports a claimant's failure to comply with prescribed treatment have recognized psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication"); Garrison v. Colvin, 759 F.3d 995, 1018 n.24 (9th Cir. 2014) (stating that the court "do[es] not punish the mentally ill for occasionally going off their medication when the record affords compelling reason to view such departures from prescribed treatment as part of claimants' underlying mental afflictions").

Thus, on remand, the ALJ shall reevaluate Plaintiff's noncompliance with treatment and prescribed medication when making his credibility finding. The ALJ should also consider whether Plaintiff's mental disorders contributed to this noncompliance.

## V. Conclusion

For the foregoing reasons, it is

**ORDERED**:

1.      The Clerk of Court is directed to enter judgment pursuant to sentence four of 42 U.S.C. § 405(g) and pursuant to § 1383(c)(3), **REVERSING** the Commissioner's final decision and **REMANDING** this matter with the following instructions:

>      (A)      Reevaluate the opinion of Dr. Gaines and Ms. Stowell, taking into account the progress notes signed by Ms. Stowell; and
>
>      (B)      Reconsider whether Plaintiff's noncompliance with treatment and prescribed medication was due to lack of funds and insurance.

2.      The Clerk is further directed to close the file.

3.      In the event benefits are awarded on remand, Plaintiff's counsel shall ensure that any § 406(b) fee application be filed within the parameters set forth by the Order entered in Case No. 6:12-mc-124-Orl-22 (In Re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) and 1383(d)(2)).

**DONE AND ORDERED** at Jacksonville, Florida on February 28, 2018.

_James R. Klindt_
**JAMES R. KLINDT**
United States Magistrate Judge

bhc
Copies to:
Counsel fo Record